UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT E. MARSHALL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 1:24-cv-11431-JEK |
| FRANK BISIGNANO, Commissioner, Social Security Administration, | ) ) ) ) |
| Defendant. | ) ) ) |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE, AND DEFENDANT'S MOTION TO AFFIRM, THE COMMISSIONER'S DECISION

**KOBICK, J.**

Plaintiff Robert E. Marshall brings this action under the Social Security Act, 42 U.S.C. § 405(g), to challenge the final decision of the Commissioner of the Social Security Administration denying his application for Social Security Disability Insurance ("SSDI") benefits. Marshall contends that the Administrative Law Judge ("ALJ") erred in concluding that he does not qualify as disabled because the ALJ did not, when explaining why he found the medical opinions of Marshall's treating providers unpersuasive, address whether those opinions were supported by the providers' evidence and explanations, as required by 20 C.F.R. § 404.1520c(b)(2). Marshall also argues that the ALJ erred in concluding that he does not qualify as disabled because, when assessing his ability to work at step four of the five-step evaluation process prescribed by regulation, he failed to discuss limitations related to Marshall's non-severe mental impairments, which he had found at step two. Pending before the Court are Marshall's motion to reverse the Commissioner's decision and the Commissioner's motion to affirm that decision. Discerning no error, the Court will deny Marshall's motion and grant the Commissioner's motion. The ALJ

1

adequately explained how he considered the supportability of the providers' opinions when he discussed inconsistencies between the evidence contained in their treatment notes and their ultimate opinions. And, read as a whole, the ALJ's decision establishes that he properly considered all of Marshall's impairments and limitations, including the mild mental limitations resulting from Marshall's depressive and anxiety disorders, in determining his capacity to work.

## BACKGROUND

### I.    Statutory and Regulatory Framework.

The Social Security Administration administers the SSDI program by providing disability insurance to covered workers. *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a). Under the Social Security Act, a claimant "seeking disability benefits must prove that [he] is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Sacilowski v. Saul*, 959 F.3d 431, 433 (1st Cir. 2020) (quoting 42 U.S.C. § 423(d)(1)(A)). To determine if the claimant is disabled within the meaning of the Act, the "ALJ employs a five-step test," which "asks questions that are sequential and iterative, such that the answer at each step determines whether progression to the next is warranted." *Id.* The five steps proceed as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). While the "claimant bears the burdens of production and persuasion at steps one through four," the ALJ must, at step five, "come forward with evidence of jobs in the national economy that the claimant is able to perform." *Sacilowski*, 959 F.3d at 434.

As relevant here, for purposes of step two, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). To determine whether a mental impairment is severe, the ALJ considers the so-called paragraph B criteria, which consist of "four broad functional areas": (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* § 404.1520a(c)(3). If the ALJ rates a claimant's limitations as "none" or "mild," he "will generally conclude that [his] impairmen[t] is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [his] ability to do basic work activities." *Id.* § 404.1520a(d)(1).

Also pertinent in this case is a claimant's residual functional capacity ("RFC"), which "is the most [he] can still do despite [his physical or mental] limitations." *Id.* § 404.1545(a)(1); *see Bowen v. City of New York*, 476 U.S. 467, 471 (1986) (RFC "measures the claimant's capacity to engage in basic work activities"). The RFC assessment is used to determine whether a claimant can perform "past relevant work," which is work that the claimant has "done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1)(i). A claimant who has the RFC to perform his past relevant work is not disabled under the Act. *Id.* § 404.1560(b)(3). When assessing a claimant's RFC to perform the requirements of past relevant work at step four, the ALJ must "consider all of [the

claimant's] medically determinable impairments," including those "that are not 'severe.'" *Id.* § 404.1545(a)(2); *see id.* § 404.1520(f).

The ALJ must also articulate how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings" in a claimant's case record. *Id.* § 404.1520c(b). When making this determination, the ALJ must consider four primary factors: consistency, supportability, the source's relationship with the claimant, and specialization. *Id.* §§ 404.1520c(c)(1)-(4); *see also id.* § 404.1520c(c)(5) (listing other factors the ALJ may consider, such as "evidence showing a medical source has familiarity with the other evidence in the claim"). Supportability and consistency "are the most important factors," and the ALJ must "explain how [he] considered" those factors "for a medical source's medical opinions or prior administrative medical findings in [a claimant's] determination or decision." *Id.* § 404.1520c(b)(2). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinio[n]," the more persuasive that opinion will be. *Id.* § 404.1520c(c)(1) (supportability factor). Likewise, "[t]he more consistent a medical opinio[n] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive" that opinion will be. *Id.* § 404.1520c(c)(2) (consistency factor).

## II.     **Factual and Procedural Background.**

Marshall was 59 years old when he applied for SSDI benefits in September 2021. *See* Administrative Record ("AR"), at 17, 41.[1] He obtained his GED in lieu of a high school diploma, and he has not worked since the onset of the COVID-19 pandemic in March 2020. *See id.* at 41-43. Marshall held a variety of jobs before then, working as, among other things, a materials handler, a machine operator, a color expert, and a customer service representative for a satellite television

---

[1] The administrative record is docketed at ECF 12 through ECF 12-16.

company. *See id.* at 43-54. In his application for SSDI, he claimed to suffer from several physical impairments—including type 2 diabetes, neuropathy in his legs and feet, high blood pressure, and Bell's Palsy—as well as anxiety and depression. *Id.* at 205.

After the Commissioner denied his application in January 2022 and denied reconsideration of that decision in August 2022, Marshall received a hearing before an ALJ in February 2023. *Id.* at 17. Following that hearing, the ALJ issued a decision again denying Marshall's application in May 2023. *Id.* at 30-31. At step one, the ALJ determined that Marshall had not engaged in substantial gainful activity since the alleged onset of his disability on June 1, 2020. *Id.* at 19. At step two, he determined that Marshall had "the following severe impairments: diabetes mellitus with peripheral neuropathy of the bilateral lower extremities; coronary artery disease status post two-vessel stenting; and emphysema." *Id.* The ALJ further concluded that Marshall's hypertension, gastroesophageal reflux disease, obesity, and headaches were not "severe impairments." *Id.* at 19-20. Turning to mental impairments, the ALJ found that Marshall's depressive disorder and anxiety disorder were medically determinable mental impairments, but that they were not severe and would cause him no more than "mild" limitations in each of the four paragraph B areas of mental functioning. *See id.* at 20-21. The ALJ also explained that his subsequent RFC analysis at step four "reflect[ed] the degree of limitation" he "found in the 'paragraph B' mental function analysis." *Id.* at 22.

At step three, the ALJ concluded that Marshall did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in the Social Security regulations. *Id.* At step four, the ALJ found that Marshall had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a)," and he noted the frequency with which Marshall could execute a variety of physical motions and be exposed to certain environmental

stressors. *Id.* Overall, the ALJ determined that Marshall could perform his past relevant work as a customer service representative because that work would "not require the performance of work-related activities precluded by [his] residual functional capacity." *Id.* at 30. The ALJ concluded, accordingly, that Marshall was not disabled within the meaning of the Social Security Act. *Id.*

In connection with his step-four analysis, the ALJ considered the medical opinions offered by three state agency medical consultants[2] and two nurse practitioners who had provided primary care to Marshall since approximately 2018—Megan Raposa, who specializes in internal medicine and cardiology, and Patricia Grindell, who specializes in endocrinology and diabetes management. *See id.* at 22-28, 2724, 2729. Both nurses offered an opinion as to Marshall's physical limitations, but only Raposa offered an opinion as to his mental limitations. Raposa opined that, during an eight-hour workday, Marshall could sit for 1-2 hours, stand or walk for 0-1 hours, and lie down or take breaks for 2-3 hours. *Id.* at 2726. Grindell opined that Marshall could sit for 2-3 hours, stand or walk for 0-1 hours, and lie down or take breaks for 0-1 hours. *Id.* at 2731. Raposa assessed Marshall's mental limitations in relation to thirteen mental abilities (e.g., understanding and completing tasks; behaving in an emotionally stable manner), and she opined that Marshall had no limitations or mild limitations for five abilities, moderate limitations for seven abilities, and a marked limitation for one ability. *Id.* at 2727.

Both nurses were asked to "discuss the medical findings and observations" supporting their opinions. Raposa's response reads in full: "Severe diabetic neuropathy, limiting him from many physical activities. Pain, financial stress causing anx[iety]/depression. Cymbalta—can cause lethargy limiting job function." *Id.* at 2728. Grindell's response reads in full: "Mr. Marshall has

---

[2] Because Marshall does not challenge the ALJ's consideration of the opinions of the state agency medical consultants, the Court does not discuss those opinions further in this decision.

had diabetes for about 20 years. He has significant discomfort from his neuropathy that results in poor sleep and chronic fatigue. Caring for his diabetes and his neuropathy is overwhelming for him. Please consider approving his application for disability." *Id.* at 2732.

The ALJ found the nurses' opinions regarding Marshall's physical limitations unpersuasive for three reasons. *See id.* at 28. Their opinions were, in his view, inconsistent with Marshall's (1) "history of conservative and partially effective treatment measures"; (2) "baseline physical examination findings," which had "consistently included a normal gait, intact sensation, full range of motion in all extremities, and full motor strength"; and (3) "reasonable range of reported daily activities, such as cooking, cleaning, shopping, driving, handling finances, and attending appointments." *Id.* The ALJ also found Raposa's opinion regarding Marshall's mental limitations unpersuasive, reasoning that it was inconsistent with Marshall's "limited subjective complaints of anxiety and depression throughout the period in question, his largely benign findings upon baseline mental status examination, and his reasonable range of reported daily activities." *Id.*

Following the Appeals Council's denial of Marshall's request for review of the ALJ's decision, that decision became the final decision of the Commissioner. *Id.* at 1-3. Marshall then filed this action for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). He moved to reverse the Commissioner's decision in September 2024, and the Commissioner moved to affirm that decision in November 2024. ECF 13; ECF 19. Following a hearing, the Court took the parties' cross-motions under advisement. ECF 27.

## STANDARD OF REVIEW

The Social Security Act authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.

7

§ 405(g). The court's role is to determine "whether the final decision is supported by substantial evidence and whether the correct legal standard was used." *Seavey*, 276 F.3d at 9. Courts "review questions of law de novo, but defer to the Commissioner's findings of fact, so long as they are supported by substantial evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *see Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). In applying this standard, the Court must be mindful "that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam). But findings of fact are not entitled to deference "'when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'" *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).

## DISCUSSION

Marshall's appeal of the Commissioner's decision raises two questions: (1) whether the ALJ failed to adequately explain how he considered the supportability of Raposa's and Grindell's medical opinions, as required by 20 C.F.R. § 404.1520c(b)(2); and (2) whether the ALJ committed an error of law by failing to discuss Marshall's mild mental limitations found at step two in fashioning his RFC at step four.

### I.     The Supportability Factor.

Marshall first argues that the ALJ failed to address the supportability of Raposa's and Grindell's medical opinions when explaining why he found those opinions unpersuasive. *See* ECF

14, at 3-8; ECF 21, at 1-3.[3] The Commissioner concedes that the ALJ did not use the word "supportability" in his decision, but he argues that "when the ALJ noted that the [nurses'] opinions were inconsistent with physical examination findings, he was effectively stating that the opinions were not supported by the examination findings of the nurses as well as other providers." ECF 20, at 9.

"Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023); *see* 20 C.F.R. § 404.1520c(c)(1). An ALJ must "explain how [he] *considered* the supportability and consistency factors for a medical source's medical opinions," 20 C.F.R. § 404.1520c(b)(2) (emphasis added), but he need not use the words "consistency" and "supportability" to fulfill this obligation. *See, e.g.*, *Darling v. Kijakazi*, No. 22-35594, 2023 WL 4103935, at *2 (9th Cir. June 21, 2023) ("An ALJ is not required to incant the 'magic words' of 'supportability' and 'consistency' in his findings."); *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024) (same); *see also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5858 (Jan. 18, 2017) (purpose of the so-called articulation requirement is to allow "a reviewing court to trace the path of [the ALJ's] reasoning").

---

[3] Although Marshall asserts in his opposition brief that "the ALJ failed to explain *both* the supportability and consistency factors" when addressing the persuasiveness of the nurses' opinions, ECF 14, at 2, 3, 8 (emphasis added), he proceeds to repeatedly emphasize that the ALJ did, in fact, address the consistency factor, *see, e.g.*, *id.* at 6 (arguing that the ALJ "explained *only* how he considered the consistency factor when evaluating the persuasiveness of each [nurse's] medical opinio[n]" (emphasis added)); ECF 21, at 2 (same). Marshall's counsel reiterated this latter point at the hearing, stating that the ALJ "did a good job as to consistency." Because Marshall has not offered any substantive argument as to how the ALJ failed to address the consistency factor, the Court considers only whether the ALJ adequately addressed the supportability of the nurses' opinions.

Here, the ALJ adequately explained how he considered the supportability of the nurses' opinions. The ALJ stated that he found those opinions unpersuasive because they were inconsistent with—that is, unsupported by—the nurses' own treatment notes and examination findings, which constitute relevant, objective medical evidence. *See Darling*, 2023 WL 4103935, at *1 (ALJ "properly considered the supportability and consistency factors" where he concluded that medical source's opinion "was internally inconsistent, as well as inconsistent with [the claimant's] work history and reports to other medical sources").[4] Before addressing the persuasiveness of the medical opinions in Marshall's case, the ALJ summarized in detail the evidence pertaining to more than 15 medical appointments that Marshall attended during the relevant time period, between September 2020 and January 2023. *See* AR, at 23-26. In particular, the ALJ discussed the evidence—including treatment notes, lab tests, and examination results—related to five appointments that Marshall had with Raposa and two appointments that he had with Grindell. *See id.* at 23-27.[5] Raposa indicated in

---

[4] At the hearing, Marshall's counsel argued that an ALJ can consider only the quality of a source's *explanation* for her opinion, and not any other record evidence presented by that source, when conducting the supportability analysis. That argument finds no foothold in the text of 20 C.F.R. § 404.1520c(c)(1), which instructs that "[t]he more relevant *the objective medical evidence and supporting explanations presented by a medical source are* to support his or her medical opinion(s)," the more persuasive that opinion will be. *Id.* (emphasis added). The plain text of this provision contemplates the relevance of *all* "objective medical evidence and supporting explanations presented by a medical source," not only the relevance of the evidence and explanations cited by the source in support of their opinion. This conclusion accords with the Social Security Administration's description of the supportability factor in its Notice of Final Rulemaking concerning revisions to the rules governing the evaluation of medical evidence. *See* 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017) (describing supportability as "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence *and* the source's supporting explanation" (emphasis added)). Marshall's framing of the supportability inquiry is, moreover, at odds with the purpose of the supportability and consistency factors, which are designed to serve as "objective measures that will foster the fairness and efficiency in [the agency's] administrative process that [its] rules are designed to ensure." *Id.*

[5] Marshall's other appointments during this period were with medical professionals at either Southcoast Health, where Raposa and Grindell are employed, or St. Luke's Hospital. *See* AR, at 23-26.

10

her treatment notes for each of these appointments that Marshall's physical and neurological exam results were largely "normal." *See id.* at 428-29, 846-47, 1062-63, 1511, 2721. She repeatedly noted, for example, that Marshall's gait was "intact," *id.* at 429, 847, 1063, 1511, 2721; that he had a "[f]ull passive range of motion without pain" in his cervical back, *id.* at 428, 847, 1063, 1511; and that his mental status was "at baseline," *id.* at 847, 1063, 1511. Grindell similarly reported largely "normal" physical and mental examination results in her treatment notes. *See id.* at 1400, 1931-32.

The ALJ also discussed evidence pertaining to the severity and treatment of Marshall's physical impairments and limitations. For example, the ALJ noted that during a May 2021 appointment with Raposa, Marshall reported that "he was feeling well," and "although he had chronic dyspnea [shortness of breath] over the previous two years," it "occurred 'only when climbing stairs.'" *Id.* at 24; *see id.* at 844 (treatment note). And during a January 2023 appointment with Raposa, the ALJ observed, Marshall reported "that his neuropathic pain made it hard for him to sit, drive, or stand for prolonged periods," but "that smoking marijuana each night 'significantly helps' his symptoms, while he obtained only mild relief from Cymbalta and Neurontin." *Id.* at 26; *see id.* at 2717 (treatment note). Summarizing two treatment notes authored by Grindell, the ALJ observed that although Marshall's blood sugar was either "above goal" or "'widely variable,'" his medications "remained stable for his blood pressure and cholesterol," his weight was stable, and he was "following a generally healthy diet." *Id.* at 24-25; *see id.* at 1398 (January 11, 2022 treatment note noting that Marshall's "disease course has been worsening"); *id.* at 1929 (May 24, 2022 treatment note noting that Marshall's "disease course has been improving").

Having summarized this evidence, the ALJ explained that he found the nurses' opinions regarding Marshall's physical impairments unpersuasive because they were inconsistent with Marshall's: (1) "history of conservative and partially effective treatment measures," (2) "baseline

11

physical examination findings," and (3) "reasonable range of reported daily activities." *Id.* at 28. The first two of these reasons reflect the ALJ's consideration of not only whether the nurses' opinions were consistent with evidence from other medical sources (the consistency factor), but also whether their opinions were supported by the evidence and explanation presented by the nurses themselves (the supportability factor). *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2).

      The ALJ first explained that the nurses' opinions were inconsistent with Marshall's "history of conservative and partially effective treatment measures," noting that Marshall had "reported at least mild relief of his symptoms with the use of medications such as Gabapentin and Cymbalta," and that he had claimed "'significant' benefit from the use of marijuana." AR, at 28. The ALJ derived the evidence of these "treatment measures" from the nurses' own treatment notes. *See id.* at 1929 (treatment note authored by Grindell indicating that Marshall's diabetes "disease course has been improving" and that "[h]e is compliant with treatment all of the time"); *id.* at 2717 (treatment note authored by Raposa indicating that Cymbalta and Neurontin had "only provided mild relief," but that Marshall "smokes marijuana each night, which significantly helps"). Thus, in describing the nurses' opinions as *inconsistent* with Marshall's history of treatment measures, the ALJ effectively explained that, in his view, their opinions were *unsupported* by the "objective medical evidence and supporting explanations" the nurses had themselves outlined. *See* 20 C.F.R. § 404.1520c(c)(1); AR, at 2728 (Raposa citing Marshall's "severe diabetic neuropathy" and the fact that Cymbalta "can cause lethargy" when prompted to explain the basis for her opinion); *id.* at 2732 (Grindell noting that Marshall "has had diabetes for about 20 years" and that he "has significant discomfort from his neuropathy that results in poor sleep and chronic fatigue" when prompted to explain the basis for her opinion).

The ALJ next explained that the nurses' opinions were, in his view, inconsistent with Marshall's "baseline physical examination findings throughout the period in question, which [had] consistently included a normal gait, intact sensation, full range of motion in all extremities, and full motor strength." AR, at 28. Once again, the ALJ derived evidence of Marshall's "baseline physical examination findings" from the nurses' own treatment notes. Raposa consistently reported that Marshall had exhibited a normal gait and full range of motion during physical examinations. *See id.* at 23-26, 428-29, 846-47, 1062-63, 1511, 2721. And Grindell reported, in the two treatment notes summarized by the ALJ, that Marshall's weight was stable, that he was following a "generally healthy" diet, and that he had several "[p]ertinent negatives for diabetes," such as "no blurred vision," "no chest pain," and "no weight loss." *See id.* at 24-25, 1398, 1929. By critiquing the inconsistency between the nurses' treatment notes and their medical opinions, the ALJ again expressed his view that the nurses' medical opinions were not supported by the evidence and explanations they had presented. *Cf. Perrino v. Kijakzi*, No. 21-cv-11267-ADB, 2023 WL 2743370, at *8 (D. Mass. Mar. 31 2023) (ALJ adequately discussed supportability where he noted that medical source's "'treatment notes do not document objective abnormalities that would support his opinion'" that the claimant had "'extreme functional limitations'" (brackets omitted)).

The ALJ also explained how he considered the supportability of Raposa's opinion concerning Marshall's mental limitations, which he found unpersuasive because it was inconsistent with Marshall's "limited subjective complaints of anxiety and depression throughout the period in question, his largely benign findings upon baseline mental status examination, and his reasonable range of reported daily activities." AR, at 28. The ALJ's emphasis on the "limited subjective complaints of anxiety and depression" reflects his view that Raposa failed to present sufficient relevant evidence to support her opinion concerning the severity of Marshall's mental limitations.

13

And his emphasis on the "largely benign findings upon baseline mental status examination" reflects his view that the results of the mental status examinations conducted by Raposa did not support her ultimate opinion. *See id.* at 2728 (Raposa stating only "[p]ain, financial stress causing anx[iety]/depression" when prompted to explain the basis for her opinion).

The Court accordingly concludes that the ALJ satisfied his obligation to explain how he considered both the consistency and supportability factors when explaining why he was not persuaded by Raposa's and Grindell's medical opinions regarding Marshall's physical and mental limitations.

## II.     The Residual Functional Capacity Analysis.

Marshall next argues that the ALJ committed an error of law by failing to discuss his mild mental limitations found at step two in fashioning his RFC at step four. At step two, the ALJ concluded that Marshall's medically determinable mental impairments—depressive disorder and anxiety disorder—were not severe because they would cause him no more than "mild" limitations in each of the four paragraph B areas of functioning. *Id.* at 21. At step four, the ALJ addressed some of Marshall's evidence concerning his mental limitations and acknowledged his "limited subjective complaints of anxiety and depression," but he did not expressly discuss Marshall's mild mental limitations. *Id.* at 28. Marshall contends that this omission constitutes reversible error. The Commissioner argues that the ALJ was not required to expressly address Marshall's mild mental limitations in his step-four RFC analysis, where it is clear from the opinion as a whole that he considered those limitations in evaluating Marshall's RFC.

An ALJ must "consider all of [a claimant's] medically determinable impairments," even those that are not "severe," in assessing the claimant's RFC. 20 C.F.R. § 404.1545(a)(2). According to 1996 guidance from the Commissioner, "[t]he adjudicator must remember that the limitations

14

identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process," and "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragrap[h] B." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996). As the First Circuit observed, "a finding of non-severity does not relieve an ALJ of his obligation to consider a non-severe impairment's impact on a claimant's overall medical condition." *Sacilowski*, 959 F.3d at 440 (citing SSR 96-8p, at *5).

The ALJ satisfied this obligation by considering Marshall's non-severe mental impairments and mild mental limitations in fashioning his RFC. The ALJ acknowledged at the outset of his decision that he was required to consider "all of [Marshall's] impairments, including impairments that are not severe," when determining his RFC. AR, at 18-19. At step two, the ALJ determined that Marshall's depressive and anxiety disorders were not severe because, "considered singly and in combination," they "do not cause more than minimal limitation in [his] ability to perform basic mental work activities." *Id.* at 20. The ALJ noted that after Marshall first mentioned experiencing depression and anxiety in January 2023, he was prescribed a trial medication pending evaluation by a behavioral health provider. *Id.* But Marshall had not otherwise "engaged in any documented formal mental health treatment" or made "any persistent complaints of mental health symptoms" during the period relevant to his claim. *Id.* Moreover, Marshall's mental status examination findings from his primary care providers and other specialists did not "reflect evidence of any significant deficits in concentration, memory, orientation, or cognitive functioning." *Id.* The ALJ also discussed Marshall's mental abilities and regular activities at length in examining the paragraph B criteria. *See id.* at 20-21. Then, at the end of the step two analysis, the ALJ wrote:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

*Id.* at 22. These first two sentences are consistent with agency guidance. *See* SSR 96-8p, at *4. And the last sentence indicates that the ALJ's consideration of the paragraph B criteria informed his step-four RFC determination. *See Robles v. Comm'r of Soc. Sec.*, No. 19-cv-1148-GLS, 2021 WL 3553788, at *4, *6 (D.P.R. Aug. 11, 2021) (concluding the same and that, based on nearly identical language at step two, the ALJ sufficiently considered all of the claimant's impairments, including her mild mental impairment, in formulating her RFC); *Margarita R.T. v. Comm'r of Soc. Sec.*, No. 23-cv-1028-GLS, 2024 WL 1297882, at *3, *6 (D.P.R. Mar. 27, 2024) (similar); *Benelli v. Comm'r of Soc. Sec.*, No. 14-cv-10785-MBB, 2015 WL 3441992, at *20, *28 (D. Mass. May 28, 2015) (similar); *cf. Lopez v. Kijakazi*, 704 F. Supp. 3d 279, 287 n.6 (D. Mass. 2023) ("By discussing the plaintiff's migraines in some depth at step two, the ALJ is presumed to have considered that impairment to the same extent in determining the claimant's RFC," given that "the ALJ acknowledge[d] that he was required to consider all the plaintiff's severe and non-severe impairments in determining her RFC.").

Next, at step four, the ALJ stated that he made his RFC determination "[a]fter careful consideration of the entire record," including "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." AR, at 22. The ALJ proceeded to describe the physical and mental symptoms that allegedly stemmed from Marshall's various impairments, including his depression and anxiety. He noted, for example, that Marshall reported having difficulty concentrating due to his neuropathic pain, that his

medications were "somewhat helpful with his mood and anxiety issues," and that he was scheduled to begin seeing a therapist on a bi-weekly basis. *See id.* at 22-29. The ALJ then explained that Marshall's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 27. Addressing Marshall's mental impairments, the ALJ noted that the record reflected "no evidence of psychiatric hospitalization, episodes of decompensation, or suicidal ideation during the time period in question," nor did it reflect "evidence of any formal mental health treatment at all." *Id.* at 28. "Even in the absence of treatment," the ALJ continued, Marshall had "generally exhibited no more than a mild degree of overall mental impairment, as illustrated by his mental status examination findings throughout the record, which [had] been largely within normal limits." *Id.* at 28-29. Ultimately, "[b]ased on the record as a whole," the ALJ concluded that Marshall retains the RFC to perform past relevant work as a customer service representative. *Id.* at 29-30.

The Commissioner concedes that most of the discussion of Marshall's mental limitations occurred at step two. ECF 20, at 15. Marshall contends that relying on this step-two analysis is improper because the ALJ was required to either include the mild limitations that he found at step two in his RFC assessment at step four or explain why he omitted those limitations from that assessment. This argument elevates form over substance. It is also inconsistent with First Circuit precedent, which instructs that the ALJ's analysis must be viewed "as a whole." *See Duffy v. Berryhill*, No. 17-1931, 2019 WL 2352960, at *1 (1st Cir. May 30, 2019) ("[E]ven if the record arguably could support an RFC assessment that includes limitations in neck movement, it was reasonable, viewing the record evidence as a whole, for the ALJ to omit such a limitation from the RFC finding."); *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (court must "revie[w] the evidence in the record as a whole" when assessing whether the Commissioner's findings are supported by

substantial evidence); *see also Furey v. Saul*, 501 F. Supp. 3d 29, 52 (D. Mass. 2020) ("'[I]t is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [multiple] steps[.]'" (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004))). When read as a whole, the ALJ's decision makes clear that he considered Marshall's non-severe mental impairments and mild mental limitations in fashioning his RFC and determining that Marshall can perform customer service work. *See Sacilowski*, 959 F.3d at 440; *Furey*, 501 F. Supp. 3d at 51-52 (ALJ "properly considered [claimant's] back pain" in assessing her RFC by "devot[ing] a lengthy paragraph" to it at step two).

Marshall's principal reliance on *Wells v. Colvin*, 727 F.3d 1061 (10th Cir. 2013), is misplaced. In *Wells*, the Tenth Circuit reversed the ALJ's decision because it was unsupported by substantial evidence. 727 F.3d at 1065, 1069; *see Alvey v. Colvin*, 536 F. App'x 792, 794 (10th Cir. 2013) ("Ultimately, the problem in *Wells* was that the [ALJ's] discussion was not supported by substantial evidence."). As a result, the Tenth Circuit did not reach the issue of whether the ALJ improperly disregarded the non-severe mental impairments found at step two in his step-four RFC analysis. *See Wells*, 727 F.3d at 1069 (concluding that "we need not determine whether the [ALJ's] discussion" of the claimant's mental impairments in his RFC determination at step four, "though far from comprehensive," "was procedurally adequate").

In this case, by contrast, Marshall does not challenge the ALJ's weighing of the evidence. ECF 14, at 10 n.1. Unlike the ALJ in *Wells*, the ALJ here did not make any affirmative statement at step two suggesting that he excluded Marshall's mental impairments from his RFC determination at step four because they were non-severe. *See* 727 F.3d at 1065, 1069. Nor did the ALJ otherwise conflate his analysis at those two steps. He recognized that "a more detailed [RFC] assessment" was required at step four despite "[t]he limitations identified in the 'paragraph B' criteria" at step two.

18

AR, at 22; *see Suttles v. Colvin*, 543 F. App'x 824, 826 (10th Cir. 2013) (distinguishing *Wells* on this same ground based on substantively similar language). The ALJ also discussed Marshall's mental health symptoms—including his depression, anxiety, and difficulty concentrating—at step four. *See* AR, at 26-29; *Suttles*, 543 F. App'x at 826 ("hold[ing] that the ALJ conducted a mental RFC assessment separate from the non-severity determination made at step two," where "the ALJ discussed evidence relating to depression and then pointedly omitted any limitation associated with that mental impairment on the RFC" at step four); *Munoz v. Comm'r of Soc. Sec.*, No. 22-cv-1492-BJM, 2024 WL 1172666, at *9 (D.P.R. Mar. 19, 2024) ("[T]he ALJ's evaluation of the paragraph B criteria was sufficient" because she "evaluated the paragraph B criteria at Step Two," "incorporated this analysis when forming [the claimant's] RFC," and "discussed [the claimant's] mental condition in her evaluation of his RFC."). Accordingly, the ALJ committed no reversible error of law in his step-four RFC analysis.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Marshall's motion to reverse the Commissioner's decision, ECF 13, is DENIED, and the Commissioner's motion to affirm that decision, ECF 19, is GRANTED. The Commissioner's decision is AFFIRMED.

SO ORDERED.

Dated: August 4, 2025

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE